UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DONALD McCAULEY and | ) | |
| PATRICIA McCAULEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-0424-TAB-RLY |
| | ) | |
| NUCOR CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     Introduction.**

In June 2003 Plaintiff Donald McCauley became a quadriplegic when he fell from the top

of his trailer truck while topping off a load of waste water at Defendant Nucor Corporation's

facility in Crawfordsville, Indiana.  Nucor retained McCauley's employer solely to remove such

waste water.  McCauley claims that Nucor negligently failed to ensure the safety of the waste

water or provide adequate fall protection resulting in his injury.  Nucor asserts that it is entitled

to summary judgment because, as a premises owner, it did not owe McCauley -- an employee of

Nucor's independent contractor -- a duty to furnish a safe work space.  [Docket Nos. 128-29.]

Even if McCauley can raise a triable question regarding duty, Nucor contends no such question

exists on the remaining elements of negligence.  [*Id.*]  McCauley and his wife, co-Plaintiff

Patricia McCauley, oppose Nucor's summary judgment motion.  [Docket Nos. 143, 147.]

Having heard argument on January 19, 2007 and the matter being fully briefed, the Court

GRANTS in part and DENIES in part Nucor's motion for summary judgment [Docket No. 128]

for the reasons set forth below.

**II.     Nucor's challenge to the McCauleys' evidence.**

Because the Court may only consider evidence that would be admissible at trial under the Federal Rules of Evidence, *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996), the Court first addresses Nucor's nine challenges to the McCauleys' evidence.  [Docket No. 155.]  The McCauleys oppose Nucor's request to strike any of their evidence.  [Docket No. 161.]  For the reasons set forth, Nucor's objections to the McCauleys' evidence are SUSTAINED in part and OVERRULED in part.

**1.     Expert reports and related evidence.**

Nucor argues that the McCauleys' disclosure of their expert reports was untimely because Donald McCauley served them beyond the agreed upon and Court approved time limit in the Case Management Plan ("CMP").  The McCauleys contend that the CMP did not require them, as the non-moving parties, to serve expert reports at any particular time before responding to summary judgment.  [*Id.* at p. 7.]  According to the McCauleys, the CMP -- as revised by agreement of the parties -- required them to disclose their experts by June 23, 2006, and only required the *moving party* to serve expert reports 60 days prior to the summary judgment deadline.

The CMP cannot be interpreted as urged by the McCauleys.  The plain language of the CMP as revised by the parties reads, " . . . if Plaintiff uses expert witness testimony at the summary judgment stage, such disclosures must be made no later than 60 days prior to the summary judgment deadline."  [Docket No. 91, ¶ 4.]  Nothing in this language qualifies the deadline as suggested by the McCauleys.  The McCauleys were obligated to "disclose the name, address, and vitae of all expert witnesses" and to serve expert reports for any expert witness

testimony they desired to use at the summary judgment stage before April 24, 2006, which was 60 days before the summary judgment deadline.[1]  Thus, the McCauleys' June 23 disclosure of expert reports and related evidence is untimely.

Federal Rule of Civil Procedure 37(c) mandates exclusion of non-disclosed expert evidence unless the non-disclosure is substantially justified or harmless.  *Musser v. Gentiva Health Services*, 356 F.3d 751, 755-60 (7th Cir. 2004).  "A misunderstanding of the law does not equate to a substantial justification for failing to comply with the disclosure deadline."  *Id*. at 758.  The McCauleys present no other defense for their untimely expert disclosure.  Thus, their belated disclosure was not substantially justified.

The McCauleys tacitly contend that Nucor was not harmed by their belated disclosure because "Nucor is well aware of the theories of negligence" in this case, and "Nucor has had ample time to review and analyze said reports within the briefing time for their reply."  [Docket No. 161 at p. 7.]  Neither of these reasons fully mitigates the effect of the McCauleys' tardy disclosure, and they overlook the imposition on Nucor's ability to conduct discovery and fully prepare its summary judgment motion.  Nonetheless, Nucor did depose at least one of the McCauleys' expert witnesses, Dr. Daniel Teitelbaum, before filing its summary judgment reply.  Nucor had full benefit of this deposition testimony in its reply and sur-surreply.  Accordingly, the Court deems the non-disclosure of Teitelbaum's report harmless and declines to strike his expert report or testimony.  With respect to the remaining expert reports, the McCauleys have

---

[1] At the January 19 oral argument Donald McCauley's counsel represented to the Court that the the lack of clear indication that Nucor would even be filing for summary judgment bolstered the McCauleys' position.  A quick review of the record belies this contention.  The parties' February 23 agreed revision to the CMP unequivocally noted that dispositive motions were expected and it even enlarged the deadline for such.  [Docket Nos. 90-91.]

not satisfied the Court that their belated disclosure was harmless.  Thus, the Court grants Nucor's

request to strike the expert testimony of John Treuting, David Mills, Stanley Pulz, and Neil

Jurinski from the summary judgment record.[2]  *See Puritan-Bennett Corp. v. Penox Technologies,*

*Inc.,* 2004 WL 866618 at *2 (S.D. Ind. 2004) (expert declaration disclosed eight days prior to

summary judgment deadline, which was beyond the agreed upon deadline, stricken from the

summary judgment record).

### 2.   McCauleys' statement of material facts paragraphs 19, 40-41, 44, 52-53, 55.

Having stricken all of the McCauleys' expert reports and evidence save Teitelbaum's, the

Court need not address Nucor's motion to strike as it relates to the stricken evidence (paragraphs

58-59) any further.[3]  What remains is Donald McCauley's competence to attest to issues of

medical causation (paragraph 19) and Teitelbaum's competence to attest to facts concerning

chemistry, chemical engineering, and the steel-making process itself (paragraphs 40-41, 44, 52-

53, and 55).

The McCauleys' statement of material fact paragraph 19 states in pertinent part:

"McCauley was overcome by fumes from the gas and rendered unable to see. . . ."  [Docket No.

143, p. 12.]  Nucor concedes that "McCauley may present testimony as to his alleged physical

condition at the time of his fall" but contends that McCauley, as a lay witness, is not competent

to testify that his alleged health effects were caused by hydrogen sulfide fumes.  [Docket No.

---

[2] This ruling is limited to this summary judgment proceeding, and it has no bearing on the ultimate admissibility of these experts' testimony at trial.

[3] Plaintiffs' statement of material facts paragraphs 58 and 59, challenged by Nucor, rely on testimony from Jurinski, Treuting, and Pulz, which has been stricken.  Although paragraph 59 also relies on page 26 of Teitelbaum's report, page 26 of Teitelbaum's report does not support paragraph 59.

155, p. 5.] The McCauleys believe none of paragraph 19 should be stricken because Donald

McCauley can testify to "what happened to him," "how it happened," and "the adverse health

effects he suffered." The McCauleys do not attempt to refute Nucor's argument regarding

causation and instead posit that other evidence, namely Teitelbaum's testimony, supports the

causation statement contained in paragraph 19. [Docket No. 161, p. 4.]

Donald McCauley is not qualified to sponsor evidence of medical causation. *See*

*Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995) (where medical effects of a toxin are not

"within the ken of the ordinary person," expert testimony is required to establish causation in

cases alleging adverse health effects). However, in this case Teitelbaum consistently opines that

hydrogen sulfide gas caused the effects described by McCauley prior to falling from his truck.

[*See, e.g.,* Teitelbaum Dep. pp. 114-15, 123, 130-31.] Nucor does not challenge Teitelbaum's

competence to attest to medical causation. As such, the Court will not strike any portion of

paragraph 19.

Whether Teitelbaum is qualified to attest to certain facts involving chemistry, chemical

engineering, and the steel-making process itself is a closer call. Nucor maintains that paragraphs

40-41, 44, 52-53, and 55 contain facts regarding these topics "on which [Teitelbaum] readily

admits he is not qualified to opine." [Docket No. 155, p. 7.] "Expert testimony is admissible

'[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand

the evidence or to determine a fact in issue.'" *Kempner Mobile Electronics, Inc. v. Southwestern*

*Bell Mobile Systems*, 428 F.3d 706, 712 (7th Cir. 2005), *citing* Federal Rule of Evidence 702.

Rule 702 provides that an expert is qualified by "knowledge, skill, experience, training, or

education." Fed. R. Evid. 702. "A court should consider a proposed expert's full range of

practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."  *Smith v. Ford Motor Company*, 215 F.3d 713, 718 (7th Cir. 2000).[4]

It is true that Teitelbaum admits he is not a chemical, chemical engineering, or steel-making expert.  [Teitelbaum Dep. at pp. 16, 42-43.]  But Teitelbaum also testified that his expertise in medical toxicology necessarily includes certain aspects of those fields.  [Teitelbaum Dep. at pp. 16, 42-45.]  For example, when asked if he is an expert in steel processing, Teitelbaum stated "no."  [Teitelbaum Dep. at p. 43.]  But his answer is qualified as follows: ". . . but to the medical toxicologic aspects of steel processing, I do consider myself an expert. . . ." [*Id.*]  He further clarified that he considers himself to be an expert on the "toxic product of the [steel] processing. . . ."  [*Id.* at p. 44.]  He has written about "medical aspects of waste water" for over 15 years [*Id.* at p. 43], and he uses "chemistry as a day-to-day activity in his work."  [*Id.* at p. 16.]  Moreover, he has over twenty years of practical experience as a board certified medical toxicologist, which includes experience in occupational medicine and acute poisoning.  During this time, he treated people exposed to toxic gases, including hydrogen sulfide.  [Teitelbaum Report at Ex. 4, p. 12.]

Based on this record, Teitelbaum's experience and training is sufficient to qualify him as an expert with respect to his testimony concerning waste water, its by-products, and the medical toxicologic ramifications of exposure to the same.[5]  Accordingly, the Court overrules Nucor's

---

[4] At this stage, Nucor does not contest the reliability of Teitelbaum's analysis and, for purposes of Nucor's request to strike and motion for summary judgment, neither does this Court.

[5] The Court notes that Teitelbaum's report and deposition testimony are not the sole evidence supporting the presence of hydrogen sulfide gas in McCauley's truck at the time he fell.

qualification-based objection to paragraphs 40-41, 44, 52-53, and 55.

## III.    Summary Judgment Standard.

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party. *Rising-Moore v. Red Roof Inns, Inc.*, 368 F. Supp. 2d 867, 872 (S.D. Ind. 2005), *aff'd*, 435 F.3d 813 (7th Cir. 2006).

Indiana negligence claims "are particularly fact sensitive and are governed by a standard of the objective reasonable person - one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004). Hence, summary judgment in these types of negligence actions is "generally seen to be inappropriate." *Perkins v. Lawson*, 312 F.3d 872, 876 (7th Cir. 2002).

---

Evidence that at least one Nucor employee noted McCauley's trailer felt unusually warm the night McCauley fell as well as positive test results for hydrogen sulfide gas in McCauley's trailer within hours after McCauley's fall, at the very least, create a question of fact on this point.

**IV.    Background.**[6]

Metalworking Lubricants Co. ("MWL") hired Plaintiff Donald McCauley as a truck driver on March 24, 2003.  [McCauley Dep. at p. 6.]  At that time, Defendant Nucor contracted with MWL as an independent contractor to remove and transport waste water from Nucor's Crawfordsville, Indiana facility.  [Johnson Dep. at p. 94.]  Nucor did not instruct MWL drivers on the method or procedure to be used for loading or unloading materials.  [McCauley Dep. at pp. 59-60.]  Nor did MWL expect or rely upon Nucor to provide training to its truck drivers.  [Bruce Dep. at p. 176; Johnson Dep. at p. 48.]  MWL trained its drivers on loading waste water, including the procedure for opening the dome on trailers.  [Johnson Dep. at p. 48; McCauley Dep. at pp. 59-60.]

MWL drivers loaded waste water from a loading bay at Nucor's galvanizing line ("galv line").  [McCauley Dep. at p. 39.]  When an MWL driver such as McCauley arrived to load waste water, a Nucor employee, usually the process operator at Nucor, had to authorize loading.  [McClure Dep. at pp. 80, 83-86; McCauley Dep. at p. 14; Johnson Dep. at pp. 155-56; Keller Dep. at pp. 46, 106, 108; Terhune Dep. at pp. 18-19.]  Before providing such authorization, the process operator was required to check the pH of the waste water to ensure that waste water sent off site was within a proper pH range and not hazardous.  [Sulc Dep. at pp. 35, 48; Terhune Dep. at p. 87; Laramore Dep. at pp. 64-66, 72-73; Weiler Dep. at pp. 31-32.]

Nucor monitored the pH of the galv line waste water using a GLI probe and sensor.  [Sulc Dep. at p. 23.]  Before a driver could load it, the waste water had to have a pH between 7

_____

[6] The facts are either undisputed or viewed in a light most favorable to the McCauleys, the non-moving parties.  In addition, this background section is a brief overview of the facts, not an exhaustive recitation of all material facts.

and 10.  [Sulc Dep. at p. 35; McClure Dep. at p. 19; Laramore Dep. at p. 166; Weiler Dep. at p. 20.]  If the pH was outside the 7-10 range, the Nucor process operator would take action to restore the pH back to that range.  [Sulc Dep. at pp. 35, 52; Weiler Dep. at p. 42.]  Specifically, if the pH was below 7 the process operator would delay loading until the pH stabilized.  [McClure Dep. at pp. 26-27.]  If the waste water pH exceeded 10, a container full of acid automatically pumped into the waste water to bring the pH down.  The acid pumped continuously until the pH was lowered or the tote emptied.  [Snellenbarger Dep. at pp. 78, 80; Sulc Dep. at p. 51; Carpenter Dep. at pp. 97, 127-28; Laramore Dep. at p. 141.]

**1.      McCauley's fall.**

On June 26, 2003, McCauley went to Nucor's Crawfordsville facility to load and transport waste water from Nucor to MWL.  [McCauley Dep. at p. 38.]  Nucor process operator William McClure initially prohibited him from loading because the pH of the waste water measured 10.7, which was too high.  [McClure Dep. at pp. 47-48; McCauley Dep. at p. 39.]  Acid was added to the waste water to bring the pH down and, after approximately fifteen minutes when the pH measured 9.97, McClure permitted McCauley to load the waste water.  [McClure Dep. at pp. 41, 49; McCauley Dep. at p. 39.]

Loading took approximately 45 minutes, during which time McCauley stayed on top of his trailer but to the rear, away from the dome.  [McCauley Dep. at p. 45.]  He monitored the level of the load in the trailer by kneeling down and looking into the trailer through the opening.  [*Id*. at pp. 50-51.]  McCauley stood above the dome and disconnected the pipe when he believed he had a full load.  He then knelt down to close the dome and tighten the wing nuts.  [McCauley Dep. at pp. 51-52; Keller Dep. at p. 117.]

9

According to McCauley, the waste water did not have an unusual smell. [McCauley Dep. at pp. 52-53.] McCauley did not feel dizzy or disoriented at any time during the loading of the waste water even when he was standing above the open trailer, looking into the opening, kneeling to close the dome, or putting away the hoses. [*Id*. at pp. 55-56.] In fact, during this entire process McCauley felt normal. [*Id*. at p. 56.]

When he thought his load was full, McCauley climbed down from the trailer and drove to the scale house to weigh out. [*Id*. at pp. 51, 54.] At the scale house, he waited approximately 30 minutes for a Nucor employee. When one did not come, he weighed the load himself and realized it was light, so he returned to the loading bay to top off his truck. [*Id*. at p. 61.] In violation of MWL's policies, McCauley did not inform Nucor or MWL of his decision to return to the galv line. [McCauley Dep. at p. 63; Johnson Dep. at p. 217.][7] The movement of the truck when McCauley drove it to the scale after initial loading and the time that elapsed before he returned to the loading bay provided the necessary time and movement to mix the metal salts in the waste water with the highly acidic waste water to create hydrogen sulfide gas. [Teitelbaum Report at p. 20.]

After McCauley returned to the bay to top off his load, he climbed the ladder to the dome and loosened the wing nuts on the dome slightly with his safety shoes. [McCauley Dep. at pp. 65-66.] McCauley did not smell anything out of the ordinary. [*Id*. at p. 71.] McCauley then leaned over to hand loosen and open the dome. [*Id*. at p. 66.] According to McCauley, as he

---

[7] Defendant directed the Court's attention to page 53 of Johnson's deposition for the factual assertion that MWL's policies required McCauley to check in with Nucor before returning to the galv line to top off his load. No such proposition was found on page 53. The Court, although not obligated to scour the record, found support for this fact on page 217.

knelt loosening the wing nuts he was overcome by fumes and "could not physically see." [*Id*. at pp. 65-66, 78.] He does not recall any tearing or burning sensation in his eyes, mouth, or throat. [*Id*. at p. 79.] Unknown by McCauley, hydrogen sulfide gas created an increase in gas pressure in the closed space of the truck, such that when McCauley loosened the wing nuts, he broke the pressure seal and allowed for the release of a fume cloud of hydrogen sulfide gas. [Teitelbaum Report at p. 20.] When McCauley was overcome by the fumes he became suddenly impaired. [*Id*.] As a result, McCauley fell off of the truck, broke his neck, and was rendered quadriplegic. [McCauley Dep. at pp. at 60-61, 65, 67.] As McCauley waited for help, he did not have any burning sensation anywhere on his body, nor did he recall feeling nauseous. [*Id*. at pp. 84-85.] Further, his vision remained impaired. [*Id*. at pp. 66, 69.][8]

Nucor employees have access to "sniffers," which are gas meters or detection devices, used to detect hydrogen sulfide. [Laramore Dep. at pp. 46-47; Sulc Dep. at p. 9; Keller Dep. at pp. 56-57.] After finding him, Nucor employees investigated McCauley's fall and checked the waste water with a sniffer, which detected hydrogen sulfide gas in McCauley's load hours after the accident. [Carpenter Dep. at pp. 22, 43-44, 48.] In addition, MWL employees also tested the load and confirmed the presence of elevated levels of hydrogen sulfide gas. [Johnson Dep. at pp. 75-76.] Nucor employee Scott Carpenter felt the trailer when he tested the load and found that it felt warm, which is consistent with an exothermic reaction in the trailer. [Carpenter Dep. at p. 147; Teitelbaum Report at p. 24.] However, none of Nucor's employees smelled the

---

[8] Nucor proffered uncontested evidence that temporary loss of vision, without any long term effects, is not a known and reported effect from exposure to hydrogen sulfide. [Evans Aff, Ex. B.]

characteristic odor of hydrogen sulfide gas on the morning of McCauley's injury.  [McClure

Dep. at p. 109; Weiler Dep. at p. 78; Haltom Dep. at p. 22; Carpenter Dep. at pp. 131-32.]

Nucor was aware that the mixture of acid with the sludge in its waste water holding tanks

that were not full would cause a reaction consistent with the creation of hydrogen sulfide gas and

that acid should not be added at that time.  [McClure Dep. at pp. 38, 52, 111-12.]  Further, while

working with waste water, other Nucor employees had smelled the rotten egg smell, which is

indicative of hydrogen sulfide gas.  [Carpenter Dep. at pp. 95-96; Teitelbaum Report at p. 27.]

Nucor employee Scott Carpenter was trained to evacuate individuals from any area where the

gas is detected.  [Carpenter Dep. at pp. 58-59.]  Even though Nucor was aware that sludge could

create hydrogen sulfide gas when mixed with acid, the sludge in the holding tanks was not

cleaned out on a regular basis prior to the accident.  [Sulc Dep. at pp. 53-54; Carpenter Dep. at p.

15; Laramore Dep. at p. 179.]

> **2.    pH meters and readings.**

Following McCauley's fall, waste water samples from McCauley's load were tested

several different times and the pH never measured greater than 2.73.  [Pace Analytical Reports;

Metalworking Lubricants Manifest.]  On two different readings taken later during the day of

McCauley's fall, MWL measured the pH of the load 1.86 and 2.03 respectively.  [Johnson Dep.

at p. 75.]  According to the EPA, a pH below 2 is hazardous, and Nucor was aware of this.  [Sulc

Dep. at pp. 23-25.]  After the accident, there was a difference in pH readings between the tank

pH meter used to test the pH of McCauley's load, and the portable meter that accident

investigators used.  [Laramore Dep. at pp. 135, 137.]

Nucor employees were unable to calibrate the analyzer on the pH meter on the tank and

had to replace the probe on that meter.  [Sulc Dep. at pp. 63, 65; Snellenbarger Dep. at p. 49.]

The pH meter on the tanks had been erratic in the past and had provided inaccurate readings in

the past, both of which Nucor was aware.  [Snellenbarger Dep. at pp. 30, 100.]

The pH meter manufacturer recommends preventative diagnostics -- including activating

a diagnostic system that will indicate if the sensor is going bad before it goes out by both a

reading and an alarm -- for the pH meter sensor because it will deteriorate over time.  [Kohlman

Dep. at pp. 39, 41, 54, 61-62.]  The pH meter manufacturer also recommends periodic

calibrations and cleaning of the sensors, pursuant to specific instructions.  [Kohlman Dep. at pp.

at 42, 44.]  Nucor did not have a schedule in place for the calibration or maintenance of the pH

meters.  Nucor process operators would call an electrician if there were any problems with the

pH equipment.  [Snellenbarger Dep. at pp. 28-29; Carpenter Dep. at pp. 6, 17.]

The pH meter malfunctioned on the night of McCauley's fall and measured the pH of

McCauley's load much higher than the actual pH, causing Nucor to add acid to already acidic

waste water.  [Teitelbaum Report at p. 16.]  Nucor did not have a cross check in place to verify

the accuracy of the pH meter reading, and the use of only one pH measurement without a cross

check was an unreliable system, allowing for frequent failures.  [Snellenbarger Dep. at p. 30.]

## V.	Discussion.

To overcome summary judgment in this Indiana negligence case, the McCauleys must

raise a triable issue of fact that: (1) Nucor owed Donald McCauley a duty; (2) Nucor breached

that duty; and (3) the breach was the proximate cause of Donald McCauley's injuries.  *Winchell*

*v. Guy*, 857 N.E.2d 1024, 1026 (Ind. Ct. App. 2006), *citing Dennis v. Greyhound Lines, Inc.*, 831

N.E.2d 171, 173 (Ind. Ct. App. 2005).  Nucor challenges the McCauleys' ability to overcome its

summary judgment motion on each of these three prongs.  The Court addresses each in turn.

**A.     Nucor's legal duty to McCauley.**

Indiana law specifies generally that "whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide."  *Winchell*, 857 N.E.2d at 1027.  With respect to premises liability, "the entrant's status on the land determines the duty that the landowner (or occupier) owes to him."  *Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind. 1991).  As an employee of Nucor's subcontractor, McCauley was a business invitee.  Although generally Nucor had no duty to provide McCauley a safe work place, Nucor did have a duty to maintain its property in a reasonably safe condition for business invitees, "including independent contractors and their employees."  *PSI Energy, Inc. v. Roberts,* 829 N.E.2d 943, 957 (Ind. 2005), *abrogated in part by Helms v. Carmel High School Vocational Building Trades Corp*., 854 N.E.2d 345 (Ind. 2006).

Any duty Nucor owed McCauley is absolved to the extent that Nucor had relinquished control of the premises at the time of injury to McCauley or his employer.  *Beta Steel v. Rust*, 830 N.E.2d 62, 70 (Ind. Ct. App. 2005).  Thus, whether a legal duty can be determined as a matter of law turns on the question of control.  *Restatement (Second) of Torts* § 414, commonly used by Indiana courts to assess control in the context of similar negligence actions, provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

As explained further in comment c of § 414, "[i]n order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done."  Accordingly, Indiana courts have found no duty arose where premises

14

owners where not aware of and/or had no meaningful oversight with respect to the injurious instrumentality. *See Pelak v. Indiana Industrial Services, Inc*., 831 N.E.2d 765, 780-81 (Ind. Ct. App. 2005) (company had no duty to employee of independent contractor employed to trouble-shoot conveyor belt when that employee fell off a cat-walk he himself had constructed incorrectly); *Armstrong v. Cerestar USA, Inc*., 775 N.E.2d 360, 372-73 (Ind. Ct. App. 2002) (milling plant owner owed no duty to truck driver employed by independent contractor the plant retained to remove waste sludge from its facility where plant did not provide personnel or equipment for the removal project).  Conversely, Indiana courts have been reluctant to find no duty as a matter of law where a question of fact over control surfaced.  *See Rhodes v. Wright*, 805 N.E.2d 382, 386 (Ind. 2004) (whether duty exists more properly left to a jury where landowner maintained loading area and determined who could enter it but independent contractor's employees took over loading area and performed their tasks with no supervision from property owner); *Beta Steel*, 830 N.E.2d at 70-71 (landowner's involvement in installation of an electrical control cabinet which was the injurious instrumentality created a question of fact concerning the existence of duty even where injured subcontractor's employee technically controlled work site at the time of injury).

Nucor contends that "Plaintiffs must show that Nucor had control over the manner in which the work was done during McCauley's second visit to the galv line when his injury occurred."  [Docket No. 129, p. 17.]  This assertion belies a fundamental misunderstanding of McCauley's claim.  The essence of McCauley's claim is that Nucor at all times retained control of the chemical composition of its waste water and the equipment necessary to monitor that composition, and that Nucor's negligent maintenance of the waste water and the equipment used

15

to do the same caused his injury.

The record before the Court shows that Nucor maintained and monitored the equipment that was used to load the waste water into MWL trucks.  McCauley had to obtain prior authorization from a Nucor process operator before he could begin loading.  Moreover, the process operator was required to check the pH of the waste water to ensure that waste water sent off site was within a proper pH range -- between 7 and 10 -- and not hazardous before he could authorize loading.  To lower pH, a Nucor process operator ensured the acid pump was on, adjusted how fast acid was added, set the level of pH by which the acid pump would empty a tote into the tanks, and changed the tote when it emptied, if necessary.  [McClure Dep. at p. 28; Snellenbarger Dep. at pp. 42, 127; Keller Dep. at p. 123.]  Significantly, Nucor, at its discretion, maintained the pH equipment and oversaw the ultimate pH of the waste water that MWL drivers loaded.  McCauley never read the pH meter when he picked up a load of waste water, and he did not know the non-hazardous range for the pH of the waste water.

There is no evidence in the record that Nucor ceded control of maintaining waste water pH or the equipment that monitored pH to MWL.  In fact, the designated record concerning Nucor's actions after the accident could lead a reasonable jury to conclude just the opposite.  For instance, Nucor added a cross check to the pH meter of the waste water tanks on the galv line with litmus paper and an alarm that will sound if an acid container empties into the waste water tanks on the galv line.  [Snellenbarger Dep. at pp. 30-31, 81; Laramore Dep. at pp. 171-72, 174-75.]  In addition, Nucor replaced the tanks holding the waste water.  [Snellenbarger Dep. at p. 27; Keller Dep. at pp. 14-15, 157-58.]  These unique facts distinguish this case from those Indiana cases where no duty was found and place it more squarely in the realm of Indiana cases

that either assume a duty or find at a minimum that a question of fact exists concerning duty.  It could even be said that the facts of this record, when construed in a light most favorable to McCauley, give rise to a reasonable inference that Nucor assumed a duty to provide non-hazardous waste water to contractors such as MWL.  Consequently, whether Nucor owed McCauley such a duty is for a jury to decide.

The same result cannot follow with respect to McCauley's alternative theory of liability.  McCauley also argues that Nucor had a duty to provide permanent fall protection.  However, the Court can make short work of McCauley's alternate theory by turning to recent direction from the Indiana Supreme Court.  The Court recently explained, "No case has found the duty to take 'reasonable steps' to impose on the landlord an obligation to see that a contractor uses appropriate safety equipment."  *PSI Energy*, 829 N.E.2d at 961.  With this direction in mind, the Court finds as a matter of law that Nucor had no duty to McCauley to provide or ensure that he used fall protection while performing the tasks Nucor contracted McCauley's employer to perform.  Therefore, the Court grants Nucor's motion for summary judgment on Donald McCauley's claim that Nucor negligently failed to provide fall protection.

**B.     Breach of duty.**

Both parties invoke *Restatement (Second) of Torts*, § 343 to assess the issue of breach of duty.  This is understandable given *PSI Energy's* early discussion of the same in the context of premises liability.  *See PSI Energy*, 829 N.E.2d at 958.  However, the Court in *PSI Energy* goes on to state ". . . we do not believe the language of the *Restatement* was framed in contemplation of claims by those conducting the dangerous activity or addressing the 'condition.'"  *Id*.  The Indiana Supreme Court in *PSI Energy* ultimately concluded that § 343 does not provide an

accurate instruction of the law in these types of premises liability cases "because it allows liability to an independent contractor's employee to be imposed upon a landowner when the employee is addressing a condition as to which the landowner has no superior knowledge.  It also would permit liability for failure to correct the contractor's omissions in safety precautions." *Id*. at 962.  Thus, this Court frames the test for breach in those terms endorsed by the Indiana Supreme Court.  Specifically, where a landowner has invited a contractor upon its property to remedy a potentially hazardous condition, breach of its duty is distilled to a factual question regarding superior knowledge of the condition contracted to be remedied.  *See PSI Energy*, 829 N.E.2d at 961.

Nucor contends that its knowledge of waste water removal was not superior to its contractor, MWL or MWL's employees.  [Docket No. 129, p. 22]  In doing so, Nucor couches superior knowledge against the general back-drop of waste water disposal.  Nucor's characterization is not accurate.  What Nucor must show is that no genuine issue of fact exists regarding its comparative knowledge of the waste water's chemical composition and/or the equipment used to monitor such.  When viewed through this lens, the Court is faced with sufficient evidence of a disputed issue of fact concerning a breach of duty to McCauley.

As detailed earlier, Nucor employees -- not MWL employees -- maintained the waste water's chemical composition and monitored the equipment for such.  In fact, Nucor maintained the pH equipment at its discretion, and oversaw the ultimate pH of the waste water that MWL drivers loaded.  [Keller Dep. at pp. 111, 122, 124; Snellenbarger Dep. at pp. 135-36; Carpenter Dep. at p. 16.]  Equally telling, the evidence creates a reasonable inference that Nucor had superior knowledge of the potentially hazardous by-products of the waste water.  For instance,

18

Nucor employees were not only trained and armed with equipment to detect hydrogen sulfide gas, they were trained on how to evacuate individuals from any area where the gas was detected. They were aware of the hazardous potential of this gas, steps they could take to lessen the potential for hydrogen sulfide gas to develop, and were trained with respect to evacuation of areas where they detected gas.

The designated record is to the contrary with respect to MWL's knowledge and training of waste water composition and its potentially hazardous by-products. During his training, McCauley was not told that the materials he picked up should be within a specific range of pH. [McCauley Dep. at pp. 192-93.] MWL employees responsible for unloading the tankers were not told what was in the trucks nor were they trained that pH level was relevant to the procedure followed for opening the dome on top of the trailer. [Smith Dep. at pp. 25, 28.] In fact, McCauley never read the pH meter when he picked up a load of waste water, and he did not know the non-hazardous range for the pH of the waste water. [McCauley Dep. at pp. 192-93.] Nucor never told MWL employees that the waste water could generate hazardous gases under certain conditions, and employees of MWL were not trained in any aspect related to hydrogen sulfide gas. [Johnson Dep. at pp. 140-41.] Based on these facts, a jury could reasonably conclude that Nucor had superior knowledge regarding the chemical composition of its waste water and the potentially hazardous ramifications of this waste water under certain conditions. Therefore, whether Nucor breached a duty to McCauley remains a triable issue of fact.

### C.    Proximate cause.

Indiana law provides that "a negligent act is the proximate cause of an injury if the injury is a natural and probable consequence that under the circumstances should have been foreseen or

anticipated." *Winchell v. Guy*, 857 N.E.2d 1024, 1030 (Ind. Ct. App. 2006). "Proximate cause is generally a question of fact. . . ." *Hellums v. Raber*, 853 N.E.2d 143, 146 (Ind. Ct. App. 2006). And so it is in this case.

Most telling, the evidence here contains dueling experts with opposing theories concerning the creation of hydrogen sulfide gas and the reason McCauley fell off of his truck. Morever, Nucor would investigate and calibrate the meter and/or replace the pH sensor probe only when a problem was reported. [Sulc Dep. at pp. 57-58.] When Nucor calibrated and cleaned the meters, it was not done pursuant to the method recommended by the manufacturer, and they were not calibrated as required by the manufacturer after cleaning. [Snellenbarger Dep. at pp. 140, 144, 153, 162.] Nucor further installed the pH meter improperly, against the manufacturer's instructions, and failed to activate all of the pH meter's failure preventative devices. [Kohlman Dep. at pp. 29-30.] A jury might reject McCauley's theory and evidence regarding the creation and existence of hydrogen gas. A jury might also determine that the pH of Nucor's waste water and the state of its monitoring equipment had nothing to do with the creation of the gas or McCauley's fall. However, a reasonable jury could perceive and interpret the evidence to the contrary.

Nucor most vigorously contests that hydrogen sulfide was created but then alternatively argues that if it was, its catalyst were materials left in MWL's trailer from previous loads unrelated to Nucor. Nucor relies on evidence that the MWL trailer used by McCauley the night of his fall was used by MWL on at least two occasions prior to the Nucor run without being

cleaned out.  [Johnson Aff. ¶ 4.][9]  The Court appreciates the need for parties to make alternative

arguments.  However, Nucor's alternative argument in this case simply highlights the disputed

nature of whether Nucor negligently failed to maintain the pH composition of its waste water in

a safe manner and whether such caused Donald McCauley's injury.

Nucor further posits that McCauley negated this causation element with his own

testimony, but Nucor's cited evidence primarily concerns McCauley's initial exposure to the

waste water and not the time period critical to this case -- namely, after the waste water had

mixed in McCauley's trailer and before McCauley attempted to open the dome for the second

time.  Consequently, whether Nucor's alleged negligence was the proximate cause of

McCauley's fall remains best within the province of a jury to decide.

## VI.   Conclusion.

With the exception of Teitelbaum's expert report and testimony, the McCauleys fail to

effectively refute Nucor's arguments in favor of striking their expert reports.  Consequently,

Nucor's request to strike the expert reports of John Treuting, David Mills, Stanley Pulz, and Neil

Jurinski is granted.  Moreover, Donald McCauley is unqualified to provide evidence of medical

causation.  Nucor's objections to the McCauleys' evidence in all other respects is overruled.

With respect to Donald McCauley's claim that Nucor failed to provide fall protection,

Nucor has shown that it owed no legal duty to Donald McCauley.  Concerning McCauley's

claim that Nucor negligently maintained the chemical composition of its waste water and the

equipment used to monitor such, Nucor has failed to establish that the facts are undisputed or

---

[9] First, the trailer had been used on June 25, 2006 to deliver MetLube B360, a product manufactured by MWL, to one customer.  It was then used to transport waste from another customer to MWL.  [Bruce Dep. at pp. 129, 141-42.]

that it is entitled to judgment as a matter of law.  Triable issues of fact remain regarding Nucor's duty to McCauley, whether Nucor breached that duty, and whether Nucor's breach was a proximate cause of McCauley's injury on the night of June 26, 2003.  Accordingly, the Court grants Nucor's motion for summary judgment [Docket No. 128] as it relates to McCauley's negligent fall protection claim but denies Nucor's motion with respect to McCauley's claim that Nucor negligently maintained its waste water.[10]

This case is hereby set for a **telephonic status conference on February 21, 2007 at 10:30 a.m.**  The purpose of this conference is to select a trial date and discuss the need for a settlement conference.  Parties shall participate by counsel, who shall contact the Court at 317-229-3660.

Dated:   02/09/2007

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

---

[10] Since part of Donald McCauley's negligence claim survives Nucor's summary judgment motion, so does Patricia McCauley's claim for loss of consortium.

22

Copies to:

Robert R. Clark
SOMMER BARNARD ATTORNEYS, PC
rclark@sommerbarnard.com

Randal M. Klezmer
KLEZMER & ASSOCIATES
rklezmer@randyklezmer.com

Robert D. Emmerson
DEFUR VORAN LLP
remmerson@defur.com

Andrew J. Miroff
ICE MILLER LLP
drew.miroff@icemiller.com

Keith A. Gaston
DEFUR VORAN LLP
kgaston@defur.com

Judy S. Okenfuss
ICE MILLER LLP
judy.okenfuss@icemiller.com

Bradley Richard Hansmann
BROWN & JAMES PC
bhansmann@bjpc.com

Russell F. Watters
BROWN & JAMES P.C.
rwatters@bjpc.com

Nicholas C. Huang
NICHOLAS C. HUANG PC
nhuang@gmail.com

Ellen Corcella
CORCELLA & KING, LLC
corcellasolutions@gmail.com

Mark Anthony King
CORCELLA & KING, LLC
makinglaw@sbcglobal.net

Terrance Lewis Smith
SMITH & DEBONIS LLC
terry@sdllaw.com